Mr. Rolfing. Good morning, may it please the court. Lawrence Rolfing on behalf of the appellant Thomas L. Garcia. Mr. Garcia was injured lifting a couch, herniated disc in his neck, eventually had surgery, was involved in a motor vehicle accident after that, and then after the last examination purchased by the government, he had a trip and fall injury. And we have opinions from various physicians, and with the ALJ, and we also have evidence that Mr. Garcia developed a depressive disorder as a result of his physical ailments. Mr. Garcia is an individual with an 11th or 12th grade education, but only went to special education classes, and ALJ found that he could perform work as a cashier. The first issue that we addressed in our brief is the issue of the mental impairment. The mental impairment issue is fairly easy to understand. Both the consultative examiner and the State agency physician, which is really the only evidence of a severity of a problems were at that time, but prognosticated that in the future he'd probably get better. And there's no evidence that that prognostication ever became true. And the ALJ seized upon the prognostication, said that he didn't have regular ongoing treatment, although there is a trial of Paxil in the record. But that's not the law of the circuit. The law of the circuit is that that's the million case. And there isn't any other basis for rejecting the opinion of the consultative examiner that Mr. Garcia had a global assessment of functioning of 50. And I know that the government's argument is that GAF scores, global assessment of functioning scores, are not dispositive, but they're evidence. And to say that they're not dispositive and then cast the baby out with the bathwater, I think, is legal error on the part of the agency. So therefore, I think that the ALJ, it's clear that the ALJ erred with respect to the existence of a mental impairment, a severe impairment affecting Mr. Garcia's ability to function. The next issue that we have in this case is the existence of a physical impairment. The ALJ rejected the treating physician opinions in this case because he found that the objective evidence didn't support the degree of limitation required. And the law of the circuit, most comprehensively framed in Lester v. Chater, is very patent. The ALJ must articulate specific and legitimate reasons. And it's clear that if a doctor gives an opinion that isn't supported by the objective record, that that's a legitimate reason. But it's only a conclusion. It's not specific. And the ALJ didn't give a specific reason. All you have to do is look at the opinion of Dr. Linder, which the ALJ eventually accepts, to find a substantial basis for the existence of problems with sitting, standing, and walking, pushing, pulling, lifting, and carrying. Dr. Linder, for instance, finds that Mr. Garcia has a decreased strength in all four extremities. Decreased strength in all four extremities. That sounds to me like Dr. Linder is saying that this person is likely to have difficulty sitting, standing, walking, lifting, carrying, pushing, and pulling. And yet the ALJ says that the treating physician opinions that impose greater limitations don't have the support of the objective evidence. The conclusion isn't supported by the record that's in this case. Dr. Linder didn't even see the claimant after his trip and fall injury, and we have the subsequent opinion that he developed a frozen shoulder syndrome thereafter. Again, the ALJ didn't address that discrete period of time, just as the ALJ failed to address the discrete period of time from the date of injury until Mr. Garcia had his next surgery and allow for some period of disability within that time frame. And again, completely failed to address that issue. The final issue that we've put forth is that the ALJ failed to address Mr. Garcia's subjective complaints. And again, we have a two-track methodology of evaluating Mr. Garcia's subjective testimony that is the specific and legitimate, the Cotton standard, or if there's no evidence of malingering, a clear and convincing standard. The district court, I think, properly recognized that this is the clear and convincing standard case. And yet, there isn't really a substantial basis for rejecting Mr. Garcia's testimony. In fact, the State agency characterized his the presence of his complaints as basically supported by the objective record. And so we don't have a basis for rejecting Mr. Garcia's record. The one factor that the ALJ did point to was that Mr. Garcia indicated that he had a twelfth-grade education in his disability report and later testified at the hearing that he had an eleventh-grade education. If we look at the disability report, he's actually marked both the 11 and 12 boxes. And then he indicates that he was in special education, grossly misspelling the word special, which is not a complex word for an individual with what we would consider a high school education. The ALJ did not articulate a specific and legitimate basis, much less a clear and convincing basis for rejecting Mr. Garcia's testimony. Kennedy. The ALJ on pain testimony said that the medical evidence doesn't support it. You disagree with that. Well, I think the ---- Excuse me. I'm sorry, Your Honor. I'm not questioning that. Your answer will be better if you listen to the question. I assume so. And daily activities, which I looked at carefully, and it seemed the only daily activity which would be inconsistent with his pain testimony is shopping. Was there anything in the record to show what the petitioner does in shopping? He goes shopping, he says. Was there any ---- I don't know what that means, whether it attacks his pain or not. Certainly, Your Honor. And that really is critical. There's a difference between going to the market and buying a loaf of bread and going to a package store and buying $500 worth of groceries and pushing the sled around. Right. And what did the record show as to what he, when he says he goes shopping, what it means? Was there anything in the record to show what he means by shopping? I don't recall there being anything in the record to develop that. And I think it was incumbent on the ALJ, if he intended to rely on that, to make it crystalline. Well, it's incumbent upon you to put in the evidence, and it's incumbent upon him to recognize the evidence. And I just didn't know whether there was even anything in the record. I don't believe that there is, Your Honor. Thank you. Do you want to save some time for rebuttal? I will reserve the balance of my time. Thank you. Thank you. We'll hear from the Commissioner at this time. Good morning, Your Honors. My name is Theophis Regans, and I'm here to represent the Commissioner, Joanne Barnhart. If you have some time, let me ask a question. Dr. Bernandez had a GAF score of 50. Apparently, this is serious. Why didn't the ALJ give some discussion of this and what it meant? Well, as Appellate's counsel has indicated, the agency does not consider GAF score directly correlative to disability determination. And in this particular instance, Dr. Bernardez, who was the consultative examining psychiatrist, although she assessed a GAF score of 50, she also did some fairly specific functional assessments. And in those functional assessments, one of the things that she says is there is no significant cognitive limitation. But if you have a 50, apparently, you may well have difficulty holding a job down. That would be significant, I would think, to the ALJ, which would require, I think, some help for us in reviewing of why he would just reject that score as insignificant. Well, I don't think that he necessarily rejected it as insignificant, but I think that the agency takes a position that, you know, the ALJ may consider that in his assessment of severity, but there is nothing that requires him to discuss GAF score. No. So if they're chopped off a leg, he doesn't have to tell how that will chop off the leg as they interfere with his work. If there's a score of 50 and that can lead to a person not holding a job, why do we have to guess what that score of 50 means? Why doesn't the ALJ tell us? Well, I don't know that a score of 50 necessarily leads to not holding a job. And the psychiatrist found in her assessments that apparently it did not. I mean, this is a psychiatrist who actually indicated that this person could understand questions, could follow directions, was able to complete the examination, could do calculations, had indicated no social restrictions, and most importantly, did not have a significant cognitive limitation. So I think what the ALJ did is he looked at the functional assessments rather than a clinical snapshot number that really has no relevance to him and no meaning to him. That GAF score of 50 doesn't have any more significance or any more meaning to the ALJ than it does to you or me, I don't believe. And actually the DMV says, the psychological, the medical journal that we use says that the GAF scale may be particularly useful in tracking clinical progress. And generally what the psychiatrists do is they write that figure down and they see the claimant at another time and they check certain indicia and they either change the number up or down. Okay. Thank you. I have a question. Can you show me in the record where the ALJ gave reasons for disputing the opinions of Dr. Farouk? Sure. He was a neurological surgeon, as I understand it, who had actually performed surgery on Mr. Garcia? Yes, there are several places where he did that. On page 27, when the ALJ talks about the physician's statement by Dr. Farouk, which indicated that the claimant was unemployable, and the multiple impairments questionnaire, he indicates that he's giving very minimal weight to that assessment because it's not supported by the objective medical findings. He also indicates that it's a subjective assessment or opinion. And accordingly, he's not going to give, he did not give it very much weight. And when we look at the record Didn't he also say that he hadn't seen him for 11 months before the letter? He certainly did. But the record indicates that he saw him two days before the letter. If the ALJ had known that I'm sorry for interrupting you. If the ALJ had known that, would his opinion of Dr. Farouk be different? I think specifically what he says is there's no record, no treatment record, prior, after March 2001. The doctor actually indicates that he saw him in January, but there's no treatment record to support that. And what the ALJ says, I believe, let me look and make sure. I think the doctor was lying when he said he saw him. Is that what he's saying? Well, I don't think that he necessarily is suggesting that the doctor was lying, but he may be suggesting that the doctor didn't treat him or do a substantial evaluation since there's no treatment record that corresponds with that particular date. And even if he had seen him a month prior, there's still about a six- to seven-month window where that doctor did not see him or treat him, or at least there are no records of that treatment. Suppose there's even an 11-month difference. If he saw him two days before, evaluated him, and wrote a letter, why would he why would the ALJ reject that letter on that basis? Well, there's no record of any evaluation. There's nothing for the ALJ to look at to determine that this doctor actually conducted a real evaluation of this claimant, of his quote-unquote patient. Doesn't the letter do that? No, the letter does not do that. I mean, it doesn't. I'm missing something here. He wrote a letter on the person's condition that he just saw two days before. You usually have an assumption that he gives a test and examination before he writes a letter. The ALJ rejects that because he didn't say, I examined this person today and I'm going to write a letter? No. I think the regulations indicate that one of the things that the ALJ considers when determining how much weight to give to a particular opinion, medical source opinion, is whether or not there are supporting treatment notes or clinical notes or objective tests to go along with that opinion. In this case, there was none. And in addition to that, he's saying that there was no longitudinal relationship, which is also important. One of the reasons that the agency generally gives more weight to a treating physician's opinion is because the treating physician is in a unique position to understand and know the claimant's limitations and the significance of their impairment because they have seen them over a long period of time and have seen them on a regular basis. In this particular case, if you didn't see him for 11 months, we can say that, indeed, it was intermittent treatment at best. And that doesn't put him in a unique position any more so than it does an examining physician because he hasn't had that kind of relationship with him. Just correct me. Is this the fellow who operated on his head? It's the person that operated on his neck, yes. And it's the same person who also indicated that the operation went well and that the fusion took Okay. I understand your argument. Okay. Let me conclude by saying that the ALJ gave, I believe, we believe, gave the claimant the benefit of the doubt. He restricted him to light exertional work. So he accepted the fact that he had a back impairment. He accepted the fact that he had a shoulder impairment. Even though he didn't make a finding with regard to the limitation of reaching with his shoulder, he included it in the hypothetical question to the vocational expert. In addition to that, he even included mild mental limitations as a result of the depression in the hypothetical to the vocational expert. What we have here is a claimant who worked for a lot of years but was injured. He can't do the work that he used to do. He used to do heavy work. And we believe that the claimant actually understands that. On page 51 of the transcript, when responding to a question from his attorney, the claimant says, If I don't know anything else besides digging ditches and trimming grass, I would have to go back to school and train, then go back to school. I've been married for 20 years to the same wife. Essentially, he doesn't feel like he's able to make the change to do a job that he can now do as a result of having been injured. Unfortunately, disability benefits are not paid because people are unwilling or unable to make an adjustment. To accidents or a limited ability to work at this point. The ALJ, in this case, gave him every benefit of the doubt. And we believe that substantial evidence supports the ALJ's decision. He can do light work. I have a question. You've got 20 seconds. Did the ALJ indicate that he had doubts about his condition because of his failure to seek treatment and failure in not getting medical Prozac? Yeah, we think that that's Isn't that, aren't those two items ones that our cases say are not appropriate? They are. They are. Your cases do say that. But this case is distinguishable from those cases. And when the treating physician actually indicated that claimant, that the claimant had a severe mental impairment, the treating physician didn't do that in this case. And when the ALJ, in this case, the ALJ can also make a determination by virtue of the fact that the treating physician did not refer him for psychiatric treatment. The policy that underlies when is that we don't punish the claimant for having poor judgment. But are we saying that we're not going to, I mean, that policy doesn't apply to a treating physician who doesn't recommend treatment. He doesn't have poor judgment. He's not the one that has the mental impairment. Somebody prescribed Prozac for him. He just said he didn't have money enough to go buy it. The ALJ says, drives that that's a negative finding. Well, but he says that he didn't have money to go buy it because his insurance lapsed. But the Prozac was prescribed to him in February of 2000. His testimony is that his insurance lapsed in November of 2001. There are several months between the two. And he didn't use his insurance to change the prescription, and he didn't use the insurance to seek other alternative treatment to see a mental health specialist. Okay. Thank you for your argument, counsel. Thank you. Mr. O'Connell. Very briefly, Your Honor. It's clear that intermittent treatment qualifies under the treating physician rule. The Gokazi case is clear. Even two visits to a doctor where the physician is concerned about the health and welfare of the patient, makes treatment recommendations, and makes recommendations to the patient about what to do and what not to do qualifies as a treatment physician. There's no doubt that the physicians in this case are treating physicians. In addition, Dr. Farooq did impose a limitation with respect to the claimant's ability to engage in the mental requirements work. He imposed a stress limitation. He said he was incapable of even low-stress work environment. Mr. Garcia doesn't have a cognitive impairment other than the fact that he needs special education as a child, but that doesn't imply that he doesn't have an emotional limitation, an inability to tolerate stress. And I think Mr. Riggins hit the nail on the head. This is a claimant with limited capacity, earned his living, supported his family with his back, and when he was robbed of that by circumstances beyond his control, he decompensated. If there's no other questions, I'll leave. I don't see any. Thank you for your argument. Thank both sides for the argument. The case just argued will be submitted for decision. We'll proceed to Avenatti v. Barnhart.
judges: Wallace, Hawkins, Thomas